ABOY, VIDAL & CO., PLAINTIFF AND APPELLANT, *v.* THE PEOPLE OF PORTO RICO, DEFENDANT AND RESPONDENT.

APPEAL from the District Court of San Juan, Section 1, in an Action for Damages.

No. 1149.—Decided July 30, 1914.

SANITARY REGULATIONS—DESTRUCTION OF PROPERTY—BUBONIC PLAGUE.—After considering the evidence introduced and the circumstances surrounding this case, it was *held:* That the houses described in the complaint, which were torn down by the Sanitary Service on account of the bubonic plague then existing in Porto Rico, were old, worthless and unfit to be repaired, a part of them being level with the ground, the roofs full of leaks, the walls decayed, and the floors rotten and infested with rats and other vermin, and that the order of the director of Sanitation to tear down the said houses was just, legal, and necessary in view of the situation by reason of the epidemic of bubonic plague.

The facts are stated in the opinion.

*Mr. Frank Antonsanti* for the appellants.

*Mr. Charles E. Foote, fiscal,* for The People.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

This action was brought under section 32 of an act entitled "An Act to reorganize the Sanitation Service," approved March 14, 1912, which reads in part as follows:

"Section 32.—That every person whose property may have been unjustly or illegally destroyed or injured by the enforcement of any order, regulation, ordinance, or by any action taken by the Service of Sanitation, or by its employees or agents exempt from personal liability, may maintain the appropriate action against the Government of Porto Rico for the recovery of proper damages;   *   *   *."

No question is raised as to the authority of the Director of Sanitation to order the destruction of the property, for loss of which damages are now sought to be recovered, if such destruction at the time of such order was, in fact, necessary as an emergency measure in time of epidemic to abate a public nuisance and remove a real menace to the public health. Indeed, the only question before us, as shown by appellant's brief and as was admitted in the oral argument of the case, is whether or not upon the whole evidence under the pleadings plaintiff was entitled to a judgment for damages as having shown that a nuisance did not, in fact, exist, or, if it did, that the abatement thereof might have been accomplished by less drastic means, and, consequently, an abuse of discretion in the exercise of quasi-judicial powers upon the part of the Director of Sanitation in arbitrarily and unnecessarily and, therefore, "unjustly" and "illegally" ordering the destruction of plaintiff's property; or, to state the concrete proposition more succintly, whether or not the buildings destroyed were, in fact, in such condition as would, under all the circumstances, justify such extreme measures as those adopted by the Director of Sanitation.

The court below, after denying a motion for nonsuit and hearing all the evidence, finally concluded that the said motion should have been sustained and, holding that while the evidence for the defense was not altogether satisfactory, plaintiff's case had not been sufficiently strengthened thereby

to overcome the legal presumption in favor of the regularity and propriety of the official action in question, dismissed the complaint.

In the view we take of the case, after a very careful consideration of the whole record, the various questions as to the weight that should properly be given to such legal presumption and the extent to which the latter may have influenced the court below and should influence this court in its consideration of the evidence, are not of vital importance and, in fact, may, for the purposes of this opinion, be entirely eliminated from our consideration.

A bare statement of the evidence adduced upon the trial will, we think, suffice without further argument to show quite clearly that the prompt action of the health authorities, confronted as they were at the time of the order complained of with a no less serious problem than the combating and stamping out of an epidemic of bubonic plague, and dealing, as they were, with buildings of the kind and character described by witnesses both for plaintiff and defendant, located within the first and most seriously infected locality attacked by the dread disease, was not only both just and legal but highly commendable and most meritorious. The very nature of the question involved, however, requires that we set forth somewhat more fully than usual the facts disclosed by the record.

Eliminating all reference to values, estimates going to the measure of damages and other matter immaterial to the main issue involved, the pleadings and the testimony may be briefly summarized as follows:

The complaint alleges that plaintiff, on July 28, 1912, and prior thereto, was the owner of houses Nos. 21 and 23, respectively, San Agustín Street, Puerta de Tierra, a ward of the municipality of San Juan; that upon July 25, 1912, plaintiff was notified by the Director of Sanitation that it was necessary that the said houses should be destroyed and that the lumber of which the same were constructed should be

caused to disappear within the period of two days after the date of such notice as constituting a menace to the public health; that by virtue of said notice the said houses were destroyed and the lumber of which they were constructed was caused to disappear; that two months prior to the order above referred to plaintiff was required by a previous order of the Department of Health to spend the sum of $500 in repairs upon the said houses and that the latter were in a good state of preservation, the destruction thereof being unjust and illegal.

Defendant, after the usual admissions and denials, answered that the houses described in the complaint were in a most ruinous condition, the lumber and other material of which the same were built being absolutely rotten, and in the month of July, 1912, constituted a public nuisance that threatened the health of the community; that in June, 1912, the existence of bubonic plague in the Island of Porto Rico, and especially in the municipality of San Juan and its wards, was officially declared, and the Department of Health began the task of exterminating rats as the carrying agent of the plague; that during the months of June, July and August of the said year the ward of Puerta de Tierra, and especially from Stops 2½ to 3½, the very neighborhood where the houses in question were situated, was the locality where rats existed and were found in the greatest number and where the greatest number of persons was falling and fell victims to the disease, twenty-four cases of plague having been recorded from June 1 to August 28 of the said year, thus demonstrating the existence of a great number of rats infected with the plague bacilli throughout the said district; that the houses Nos. 21 and 23 described in the complaint were situated in San Agustín Street, Stop 3½, Puerta de Tierra, and that in these houses, during the months of June and July, rats were found in great numbers, and that in the month of July the said houses were disoccupied, not only because of the large number of rats that took refuge in the

same, but also because they were in such bad sanitary condition and so absolutely rotten as to be wholly unfit for human habitation; that during the months of June and July employees of the Sanitation Service inspected the said houses, finding the same in unsanitary condition, in violation of the health laws and regulations and constituting a public nuisance and a menace to the health of that neighborhood; that the said houses were built of wood and roofed with zinc, with wooden flooring; that they were two of the first that were built in the ward of Puerta de Tierra, and both walls and floors were completely rotten, the former not joining either the roof or the flooring owing to the absolutely rotten condition of the lumber; that there were wide openings where the walls joined the floors, by means of which the rats had free access to the interior of the said houses, and the roofs were corroded by the weather; that the floors of the two houses were formed of rotten lumber and rested upon the ground without protection of any kind and nearly all of the boards were loose and broken; that owing to the ruinous condition of the two houses in question the floors were full of rat-holes and beneath the same and in the ground below rat-nests and dens were found on July 25, 1912, and prior thereto in numbers impossible to state; that where the walls failed to meet the floors and where they should have joined there were also holes that served as shelter for the rats; that the two houses were in such ruinous condition that they were about to fall and all the timbers were filthy and rotten; that during the months of June and July, 1912, employees of the Department of Health found in both of the said houses a great number of rats, and among them, in the latter part of July, one that was infected with the plague bacilli; that owing to the unsatisfactory condition of the said houses in that they were full of rat-nests and offered safe refuge for the rodents, the Director of Sanitation, on July 25, 1912, issued an order addressed to plaintiff directing the abatement of the public nuisance in question, three cases of plague

out of the total of twenty-four recorded in Puerta de Tierra from June 1 to August 28 having occurred between June 22 and July 3 at Stop 3½, where the said houses were located, and seven other cases out of the said total having been found likewise during the said months of June and July between Stops 2½ and 3; that the said houses constituted a public nuisance and a serious menace to the public health and that the order complained of was not only just, legal and necessary, in accordance with the law and required by the circumstances, but was the only means of abating the said nuisance and removing the danger that threatened the community.

FOR PLAINTIFF:

*Teodoro Vidal* testifies that in July the houses in question, tenement houses (*ranchones*) occupied in part by tenants but always with a store (*tienda*) at the corner, were pretty old but habitable and almost always occupied; that they were built of wood and roofed with zinc and the floors were good in some places and in others not; that witness is unable to describe the condition of the bad floors, but that the flooring was not entirely bad, although certain parts thereof may have been rotten; that witness bases his estimate of the value of the house upon the lumber and the zinc that were there; that the buildings (*ranchones*) were tolerably habitable and that there had been a restaurant in the smaller one, but owing to the requirements of the sanitary authorities as to floors, sinks, etc., the restaurant was removed and the building was thereafter used for the storing of lumber; that witness does not remember whether the floor was raised or rested directly on the ground; that the studding (*estantes*) were susceptible of use for other purposes, but witness cannot state whether the boards which were burned by order of the sanitary authorities might have been so utilized.

*José Morán* states that for a period of about two years previous to the outbreak of plague, but how long before he

cannot state, witness rented from plaintiffs three doors of the house (*ranchón*) fronting on San Agustín Street, paying forty dollars per month therefor.

*Luciano Lanclos* testifies that he was for two or three years in charge of the houses (*ranchones*) Nos. 21 and 23 of San Agustín Street, during which time he made repairs thereon, particularly in the part occupied by the *tienda* and upon the roof; that some months prior to the outbreak of plague witness ceased to administer said houses; that the latter had been used as lodgings, restaurant and store; that during the three years of his management the buildings were always occupied by one tenant after another; that shortly before the outbreak of plague the floor in the rear was renewed and the side toward the San Antonio Dock Company was closed with concrete and a new roof of galvanized iron was made between the store and the milk-stall; that the said milk-stall belonged to Infanzón & García, and was there up to a short time before Aboy, Vidal & Co. took it; that witness had a peon to whom he gave $3 and a room for cleaning the corrals and stopping leaks; that the repairs were regularly made; that the *tienda* might have lasted four or five years, as it had been provided with new zinc and had been painted, and the restaurant, if the floor were repaired, might last indefinitely; that defendant ceased to administer the property four or five months prior to the plague; that at the time he left there was no milk depot; that as to the rest of the building, breaks in the floor were covered as they occurred and boards taken out and renewed; that the breaks in the floor were not frequent and that there were no leaks in the roof until a few months prior to the outbreak of plague.

*Juan de la Cruz* says that as carpenter he often repaired the floors of the buildings (*ranchones*) and made a concrete floor in the part occupied by the restaurant; that during the period of the plague witness worked as a carpenter for Aboy, Vidal & Co. and upon various occasions made repairs upon the buildings, in the store and in the res-

taurant; at the instance of the sanitary authorities he repaired the floors of the building several times, and upon one occasion made a concrete floor in the restaurant; that the repairs were made with new tongue-and-groove flooring furnished him by Aboy, Vidal & Co.; that witness once put a new zinc roof upon the *tienda* and ceiling therein a year or two previous to the plague; that the building was used as family lodgings, wayside stores (*ventorrillos*), store (*tienda*), restaurant and dairy; that all of it was always occupied except the restaurant, which was used for lumber.

*José Lucero,* who succeeded Luciano Lanclos as manager, says that he often repaired the floors of the buildings (*ranchones*); that the house No. 21 was used as a tenement house, restaurant and store, but the restaurant was in a little house apart; that the store belonged to José Morán; that in making repairs new pine lumber was used; that the buildings (*ranchones*) might have lasted indefinitely, as the bad portions were being continually made over and renewed; that the house (*ranchón*) was an ordinary wooden house (*ranchón corriente de madera*) like all others in the ward, divided into rooms; that witness cannot remember the repairs that were made upon the building because the repairs in the floor were being constantly made; that witness does not remember whether the walls were altered, but is positive that the floors were completely changed, although he does not remember the date; that at the time of the destruction of the buildings the floors were almost entirely new; that the floor of the restaurant was at that time old but not broken; that the houses were in a fair condition and habitable.

FOR THE DEFENDANT:

*Dr. W. F. Lippitt,* Director of Sanitation, testifies that the principal hotbed of the epidemic was in Puerta de Tierra in the neighborhood of Stops 2½ to 4 and 5, and generally to the south of San Agustín Street; that the disease is carried by rats and that the rat is therefore the first point of

attack in a campaign against the plague; that the rats generally, and especially in provision stores, live beneath the floors when close to the ground, in double partitions, and in the roofs of the houses; that in July, 1912, witness ordered the destruction of the two houses (*ranchones*) belonging to plaintiff because of the protection that they afforded to rats, having, to witness's knowledge, in a general way, very low wooden floors; that witness cannot state positively that the house was infested with rats, but that it could very well serve as a refuge for rats; that witness issued the order because the houses were in a ruinous condition, and, in the opinion of witness, it was impossible to put them in such condition as not to constitute a menace to health, in view of the epidemic; that, in the opinion of witness, the said houses at that time were a public nuisance; that this opinion is based upon the general condition of the building; that after the 20th of June witness made a very general inspection of the said building, because the destruction of the same had been recommended, and witness, therefore, merely looked at it in order to see whether the destruction thereof was justifiable; that witness does not remember the height of the houses with reference to the sidewalk on San Agustín Street, but the floor on San Agustín Street was almost on a level with the sidewalk, if not even lower, although as to this witness cannot state positively; that witness believes the ground upon which the building stood sloped to the south, although witness cannot state the height of the floor from the ground in the rear, as witness was not in the rear of the house more than once or twice and not with the idea of determining that fact; that any house with wooden floors close to the ground is a menace in time of plague; that witness, during the period of the plague, never made inspections in detail but only in a general way in Puerta de Tierra; that witness believes that he was in the Aboy, Vidal & Co. houses but could not swear it; that the houses were not three feet above the ground; that in the rear perhaps they were but not their

whole length; that the floor in front almost rested upon the ground, although witness cannot state positively that it was upon a level with the sidewalk; that witness entered the courtyard of the house and only saw the general condition of the same, not being able to state exactly the distance from the floor to the ground; that the inspections were made by the inspector who reported to the office of Dr. Creel, who was at that time specially in charge of that work; that thereupon one of the engineers visited the house in company with Dr. Creel and they determined any question of repairs; that in case of destruction the matter was submitted to witness as director, being a matter of importance; that witness went to visit the building as the result of a complaint made by the inspectors, but witness cannot say who were the inspectors mentioned; that Dr. Creel was in charge of that sort of work in San Juan under the direction and daily supervision of witness; that ordinary repairs were made without consulting witness, but no building was destroyed, unless it were a hut of no importance, without previous submission of the case to witness.

*Dr. José Gómez Brioso,* Chief of the Bureau of Transmissible Diseases in the Department of Health, states that all of the places attacked by the bubonic plague were in Puerta de Tierra, between Stops 2½ and 6, from Stop 2½ to Stop 3, and from Stop 3 to 4; that during the first half of the epidemic witness accompanied the health officer in nearly all of the residential visits; that witness was never in the houses Nos. 21 and 23, although he knew the spot and the buildings (*ranchones*); that in July, 1912, the said buildings (*ranchones*) were in very bad sanitary conditon; that witness was never in the said houses in his official capacity, as he only accompanied the health officer in visiting the houses where plague cases existed; that witness, in the exercise of his profession as physician, had been in said buildings (*ranchones*); that, in the judgment of witness, the said buildings (*ranchones*) were in bad condition; that there was danger

of an epidemic of plague because the houses were located between Stops 3 and 4, which was the focus; that witness believes the said buildings (*ranchones*) might have been put into such condition as not to constitute a menace to the community, rebuilding them; that, taking them as they were, they could have served as refuge for rats; that during the period of the epidemic the houses, as they were, could have constituted a nuisance; that witness regards the spot mentioned as very much attacked; that roundabout the buildings (*ranchones*) were inhabited houses; that as Chief of the Bureau of Transmissible Diseases all reports from the Island necessarily come to the office of witness; that the case of Facundo Costoso was at Stop 3½, as were also the cases of Fernando Navarro and Catalino Maldonado; that of Mauricio Sierra was at Stop 4 and those of Guillermo Pizarro, Felipe Muñoz and Crecente Iglesias at Stop 3; that this occurred during the month of June, 1912; that witness last saw the building (*ranchón*) in June; that witness did not visit the said building because the plague was there; that witness cannot remember when he last visited the said buildings (*ranchones*) but believes that it was before the plague, very shortly before; that as physician he practiced in the said ward; that he does not remember the character of the illness of the patient there visited, but that it was not a serious case; that witness does not remember how many times he visited the building; that as health officer witness was never notified of any contagious disease in the said buildings (*ranchones*); that the danger from the bubonic plague existed throughout the ward of Puerta de Tierra as well as in the city proper; that the buildings (*ranchones*) might have been isolated so as to impede the sheltering of rats, but witness believes that the better measure was the destruction thereof, as the condition of the houses was extremely bad, although witness is not an expert and only voices his impression; that rats are better protected in old buildings when the floor is near the ground and there is food for them;

that the opinion of witness was that all houses constituting
a public nuisance must be destroyed; that witness speaks in
general terms; that if a house were of great value witness
was of the opinion that other measures should be resorted
to for the protection of health without necessity of destruc-
tion; that any building can be made rat-proof; that the
better measure, honestly, was destruction as the better means
of avoiding the propagation of the disease; that destruction
is better because the cost of repairs is excessive; that wit-
ness never examined the said house inside; that witness
entered the same but did not examine it; that witness can-
not state whether the floor rested upon the ground; that
witness cannot speak as to the floor but only as to the house
as a whole; that witness did not examine the house in detail
but knows that it was inhabited.

*Dr. José S. Belaval,* health officer in May, June, July and
August, 1912, testifies that he examined the buildings (*ran-
chones*) of plaintiff and found them in ruinous condition;
that the examination was made during the pest and they had
been ordered closed previously and a part of the said build-
ings was destroyed by the owners thereof prior to the pest;
that the buildings, as well as the water-closets, were in ruin-
ous condition; that witness does not remember if the floors
were bad, but that witness advocated the destruction of the
buildings as being in very bad condition; that witness can-
not state positively that the non-destruction of the said
houses would have been dangerous to the community; that
there would have been the same danger that exists in all
houses that are not in sanitary condition, that are ruinous;
that witness is not certain whether the building (*ranchón*)
that was destroyed before the plague and was afterwards
rebuilt belongs to plaintiff because witness has not had time
to examine the files, but witness remembers that there was
in the house (*ranchón*) fronting San Agustín Street and
contiguous thereto another in worse condition, but witness
refers to the property in general; that the same was not in

a sanitary condition; that it was ruinous in general appearance but witness cannot give details, more than a year having elapsed; that witness has an idea that the roof was of zinc, but is uncertain whether the same was smooth or corrugated zinc; that the walls and partitions were of wood, although witness does not remember exactly the general appearance of the houses beyond the fact that they were in ruinous condition and unsanitary; that ''unsanitary condition'' means the bad state of the water-closets, a dirty house, floors in bad condition, roofs that leak and defective walls; that the water-closets in those houses were at one time fixed up; that the general condition of the houses at the time they were destroyed was more or less the same; that witness made the inspection during the bubonic plague; that witness cannot remember details, but remembers perfectly the general condition of the houses, and it was bad, and witness does not remember whether they were occupied at the time they were destroyed; that one was a large house, six or eight doors, but witness does not remember the exact dimensions and did not examine the boards; that the house was raised somewhat from the ground in the rear, but in front was on a level with the sidewalk, and on the corner there were steps, but on the other side it was lower; that the floor was very close to the sidewalk, although witness did not measure it.

*Enrique Peterson* states that in the month of July he examined the two houses (*ranchones*), property of plaintiff, finding them in bad condition; that there were various holes in the floor through which witness passed his hands in order to place small rat-traps; that some of the walls joined the floors; that there were some broken places in that part of the house fronting San Agustín Street, next to the sidewalk; that the front part of the house joined the sidewalk and in the rear there were various boards that admitted the placing of rat-traps; that rats were caught, although few in number, in the said house during the epidemic in June and July; that the walls that did not join were made of broad boards

and were single so that they offered no shelter to the rats; that there were a good many holes in the floors, and while witness cannot state that there were holes in all the rooms, witness believes that most of the rooms had them; that witness thinks said holes were due to the age of the house; that witness does not know whether the sanitary authorities ordered the said holes made in order to place rat-traps; that the roofs were also bad, as the zinc was broken in places; that one could see through the roof from the inside; that witness was never in the house during a rain and does not know if it leaked; that witness does not know how many rats were caught in the buildings, but went there daily to place the traps; that during the time witness visited the buildings they were occupied, and there was a room with charcoal in it, but no store; that the building was rather dirty; that witness does not remember what he saw in the small house separate from No. 23, nor the condition of the building where lumber was stored.

*Francisco Conde,* employee of the Health Department engaged in the public cleaning of Puerta de Tierra, states that he was ordered by the health officer to inspect all the court-yards (*patios*) and observed that the walls and floors of the buildings (*ranchones*) in question were in bad condition; that the walls were worm-eaten and some of the boards were loose in the rear; witness removed from the room of a woman named Dolores much trash piled in the corners of the house, the walls of which were lined with an impervious cloth; that the zinc was in bad condition, corroded and in various places ceiled with impervious cloth; that the floor of the portion occupied by the merchant Morán was raised something more than a meter, but the room occupied by Dolores was low; that the boards in front were worm-eaten; that the inspection was made by witness between the 19th and 22d of June during the plague; that witness went there to clean the corral, but that he had to enter the house to remove trash from beneath the floor.

*Juan C. Vélez* testifies that he knows the buildings (*ranchones*) as he carried on a business there—refreshments, sweetmeats and cigars; that he left the place four months prior to the outbreak of the plague, and when he was there the rats ate his cocoanuts and damaged his sausages; that witness cannot calculate the number of rats, but that there were also other vermin; that in the part of the building occupied by witness the floor was broken and contained cracks which witness covered to prevent the rats coming up and robbing him of what he had; that the portion occupied by witness was clean; that leaks in the roofs wet the provisions; that witness did not repair the roof to avoid wetting the provisions but gathered together the latter; that when witness complained to the owners they told him to paint it and repair it himself, but as the house was not his he did nothing; that he did not fear rain at night because he left everything collected under the counter or covered with boxes; that the refreshments were kept in bottles and witness hung the sausages in the show-case and they disappeared during the night; that during the time witness was there no repairs were made in the floor of his establishment.

*Higinio Brillanes* states that he knows the buildings; that he roomed there four years and ran the restaurant eight years in the little house in (adjoining?) No. 23, and left some four months before the plague because the house was closed by the sanitary authorities; that the house was not in good condition; it was wet and there were holes in the floors and the wall in the rear was bad; that plaintiffs put concrete in the kitchen; that there were a good many rats; that the restaurant, after witness moved, they ordered torn down; and before that, when witness moved, they put lumber in it.

*Emiliano Barrientos* testifies that he knows the buildings (*ranchones*) Nos. 21 and 23; that he lived eleven months in No. 21 until the health authorities ordered him to move; that the room in which he lived was in bad condition; that

it was wet and the walls were worm-eaten and the floors rested upon the ground; that the roof was bad and leaked and there were all kinds of vermin, scorpions, cockroaches, rats, etc.

That the evidence for the defense leaves much to be desired in the way of accuracy of detail and positiveness of assertion upon the part of witnesses whose plain duty was to know the facts and who should have been able to speak in no uncertain tone in regard thereto, cannot be denied. There is, however, small comfort for plaintiff in the testimony for the defense taken as a whole, and we cannot agree to the proposition so insistently urged by appellant that the elements wanting in the plaintiff's case, as made, have been supplied by the evidence introduced by the defense. However reprehensible the vague uncertainty as to details that should have been definitely ascertained and made a matter of record, or in some way carefully preserved for future reference may be, it is reasonably clear that the houses in question were old, ramshackle buildings, very much out of repair, with leaky roofs, worm-eaten walls and rotten floors, resting in part, at least, upon the ground and infested with vermin. There is practically nothing in the record to contradict this conclusion, which can be drawn almost as readily from the very vague and uncertain testimony of plaintiffs as from that of defendant, and there is nothing to show definitely that plaintiffs, if given the option of destroying the buildings or making them rat-proof, would have elected the latter alternative, or that the same could in any event have been put in a sanitary, rat-proof condition without practically complete demolition and reconstruction, and at an expense out of all proportion to the actual value involved. There is, in short, nothing in the evidence upon either or both sides of the case upon which to base a definite conclusion that the order of the Director of Sanitation was either unjust or illegal.

We need not rehearse here the story of the plague in Porto Rico, nor need we dwell at length upon the seriousness of the conditions that obtained at the date of its first appearance. The historical facts are or should be fresh in the mind of every thoughtful resident of the Island. It is human, however, to forget and underestimate a danger that is past, and methods and measures that seemed at the time justly open to bitter criticism, as much too conservative and entirely inadequate in the face of the impending peril, may, in the course of time, come to appear to the impulsive and unwary mind as unnecessarily harsh and severe and wholly unreasonable and unjustifiable. We should not lose sight for a moment of the actual situation at the time of the destruction of plaintiff's property, a situation that called for swift and decisive action, executive ability of a high order, unflinching moral courage, and unswerving devotion to duty on the part of the men upon whose shoulders rested the responsibility for such proportions as the prospective scourge might attain; and viewing the whole testimony in the light of that situation, we do not hesitate to hold that the action of the health authorities complained of was, as we have already suggested, not only just and legal, but most imperatively necessary and preeminently proper and praiseworthy. Any other course under such circumstances in dealing with old, more or less dilapidated buildings infested with rats and other vermin and standing in the very hotbed of the disease; any faltering, wavering, or delay, or dallying with such halfway measures as orders for rat-proofing and repairs with the accompanying details of estimates, plans and specifications, protests, injunctions, and other devices for killing time instead of rats, not to mention the time required to accomplish the task once actual work should begin, would have amounted to a morally criminal dereliction of official duty, and if pursued or persisted in as a definite general policy, would no doubt have resulted in a very dark and gruesome chapter in our local history, instead of what now

seems to many a comparatively insignificant incident as trivial in its nature as it was transient in its duration, and remarkable only by reason of its enormous cost calculated exclusively in dollars and cents.

We find no reason for disturbing the judgment of the court below and the same must be affirmed.

*Affirmed.*

Chief Justice Hernández and Justices Wolf, del Toro, and Aldrey concurred.